**UNITED STATES, Appellee,**

v.

**Colonel Rafael A. RIVERA,
582–22–7763, United States
Army, Appellant.**

**ACMR 8601090.**

U.S. Army Court of Military Review.

19 May 1988.

as being multiplicious for findings, and the members were instructed to disregard that charge in arriving at an appropriate sentence. The military judge also instructed the court members that adultery was not separate from the offenses of sodomy and indecent acts for the purpose of determining a sentence. The appellant was sentenced to a dismissal and the convening authority approved the sentence.

These offenses resulted from what started as a therapist-patient relationship between appellant and Mrs. A, the wife of an Army officer. Mrs. A was referred to appellant, a psychiatrist, for therapy after seeking medical help for drug dependency and chronic drug abuse. After approximately one year of therapy sessions, Mrs. A testified that appellant asked her, during one of her scheduled sessions, if she thought she could have sex with him and keep that relationship separate from the therapy. Mrs. A, who was seeing appellant twice weekly as an outpatient, said she did not know whether or not she could make such a separation. Mrs. A's next therapy session was uneventful. However, when she returned to appellant's office the following day for scheduled therapy, she gave him two lottery tickets. The appellant then initiated physical contact which culminated in sexual intercourse.

During ensuing office sessions, appellant engaged in a variety of sexual acts with his patient. These included vaginal intercourse, fellatio, cunnilingus, mutual masturbation, and appellant masturbating and ejaculating on Mrs. A. This pattern of sexual activity continued for approximately six months during Mrs. A's scheduled visits for outpatient therapy in appellant's office at Walter Reed Army Medical Center (WRAMC). The scheduled "therapy" ended with appellant's reassignment overseas for one year.

Although the office encounters with Mrs. A ended when appellant was reassigned, he returned to the Washington, D.C., area on at least four occasions while stationed overseas. On each occasion, he contacted Mrs. A and arranged to meet her at a local motel. At these meetings, appellant and

For Appellant: Colonel John T. Edwards, JAGC, Lieutenant Colonel Russell S. Estey, JAGC, Major Eric T. Franzen, JAGC, Captain Lorraine Lee, JAGC (on brief).

For Appellee: Colonel Norman G. Cooper, JAGC, Lieutenant Colonel Gary F. Roberson, JAGC, Captain Carlton L. Jackson, JAGC, Captain Jody M. Prescott, JAGC (on brief).

Before HOLDAWAY, De GIULIO and CARMICHAEL, Appellate Military Judges.

## OPINION OF THE COURT

CARMICHAEL, Judge:

The appellant was tried by a general court-martial composed of officer members. Pursuant to his pleas, he was convicted of sodomy, adultery, indecent acts with another, conduct unbecoming an officer, and use of an expired Drug Enforcement Agency number. The charge of conduct unbecoming an officer was subsequently dismissed

Mrs. A engaged in sexual activity similar to that which had occurred in appellant's office at WRAMC. Subsequently, appellant was reassigned to WRAMC and became Assistant Chief of Outpatient Psychiatric Services. He resumed the same pattern of sexual activity with Mrs. A that had been established before his overseas assignment. She was scheduled for therapy, came to appellant's office at WRAMC, and, while there, engaged in various sex acts with him. These "scheduled" sex-therapy sessions continued until Mrs. A informed appellant that her husband had found her diaries detailing her sexual involvement with appellant.

During the sentencing phase of the trial, Mrs. A testified that appellant had saved her life by freeing her from her addiction to the pain-killer, "Darvon." Mrs. A further testified that the appellant had become "so important ... as far as keeping [her] off those pills that were killing [her]." She was frightened that he might become angry and stop seeing her. Consequently, she "guessed" she would have done anything to ensure that appellant would continue to treat her.

The appellant's sexual relationship with Mrs. A lasted for approximately twenty-eight months. Having initially helped Mrs. A during the first year of therapy, appellant, after becoming involved with her sexually, prescribed a drug containing codeine to help ease her tension headaches. Mrs. A testified that she found herself becoming dependent on this drug, and continued her sexual involvement with appellant so he

would continue prescribing it for her. Some seven months after appellant stopped treating her, she was hospitalized for drug dependency.

The appellant alleges, *inter alia*, that the military judge erred by denying the defense's motion to exclude testimony on the "therapist-patient sex syndrome." We agree but find the error to be harmless under the circumstances of this case.

■ Because appellant's conviction was based on provident guilty pleas, this issue centers on the introduction of aggravating factors during the sentencing phase of the trial. Specifically, it focuses on the expert testimony of Dr. Bouhoutsos, a clinical psychologist. Regarding this issue, defense made a motion *in limine* to prevent Dr. Bouhoutsos from testifying for the prosecution on the merits of the case. During argument of the motion, the defense conceded that some of Dr. Bouhoutsos' testimony would be relevant for sentencing purposes. The defense did not, however, concede the existence of a therapist-patient sex syndrome. Although the military judge denied the motion, the issue became "moot" to the extent it was directed toward testimony on the merits when appellant subsequently decided to plead guilty to the charges. In denying the motion, the military judge ruled that expert testimony on the therapist-patient sex syndrome was admissible under Mil.R.Evid. 702.[1] But he deferred ruling on the defense's objection that the testimony was further inadmissible under Mil.R.Evid. 403,[2] reasoning he

---

1. Manual for Courts–Martial, United States, 1984 [hereinafter M.C.M., 1984], Mil.R.Evid. 702 states:

 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

 The analysis of Mil.R.Evid. 702 indicates that the Rule may supersede *Frye v. United States,* 293 F. 1013 (D.C. Cir.1923), because its "sole explicit test is whether the evidence in question 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'" The analysis also provides that "[w]hether any particular piece of evidence comes within this test

is normally a matter within the military judge's discretion." M.C.M., 1984, Analysis of Mil.R. Evid. 702, App. 22, A22–40.

 The *Frye* standard for the admissibility of expert testimony is that such testimony should be admitted only if deduced from a principle shown to be generally accepted as reliable within the expert's particular scientific field.

2. Mil.R.Evid. 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the members, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "Rule [403] vests the military judge with wide discretion in determining the admissibility of evidence that

would have to hear Dr. Bouhoutsos' testimony to determine its relevancy.

Once appellant's negotiated pleas were accepted as provident, counsel for both sides marshaled their formidable skills in an effort to have the court members adopt their respective views concerning an appropriate punishment. The trial became a battle of experts—psychiatrists and psychologists—offering opinions on whether Mrs. A was sexually exploited by appellant, or was a calculating seductress who actively sought a sexual relationship with appellant during therapy.

As part of its evidence in aggravation,[3] the prosecution called Dr. Bouhoutsos as an expert witness of psychology and the effects of therapist-patient sexual acts. The witness was accepted as an expert in these areas without objection by the defense. She then proceeded to testify, based on her research, as to the harm done to a patient by a "sexualizing therapist." When she began relating what Mrs. A had told her as the underlying basis for her opinion, the defense objected that Dr. Bouhoutsos was in effect bolstering Mrs. A's credibility. The military judge, in response to the defense's objections, instructed the members not to consider Dr. Bouhoutsos' testimony concerning what Mrs. A told her for the truth of the matters asserted, but only as information from which the witness had reached her conclusions.

In referring to the "therapist-patient sex syndrome," Dr. Bouhoutsos identified its etiology as nineteen specific symptoms, seventeen of which were manifested by Mrs. A. Examples of these symptoms are ambivalence, guilt, feelings of isolation, sexual confusion, severe depression, and ritualized and repetitive sex. In short, Dr. Bouhoutsos was testifying to the harm suffered by Mrs. A because of her sexual relationship with appellant. To the extent that she testified that Mrs. A exhibited the symptoms of the therapist-patient sex syndrome, she did, as appellant contends, give a degree of "scientific legitimacy" to the prosecution's theory that Mrs. A suffered serious psychological harm as a result of appellant's actions.

■■■ Clearly, from our review of the record, the therapist-patient sex syndrome is a novel scientific theory. At the time of trial, it had been in existence for approximately one year. Almost all of the research in the area had been done by Dr. Bouhoutsos and one of her associates. The syndrome is not recognized in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM III) published by the American Psychiatric Association. Nor has it been made part of the revised DSM to be published sometime in the future. While recognizing that the Court of Military Appeals has construed Mil.R.Evid. 702, together with the evidentiary rules of relevance,[4] as the controlling standard for the admissibility of scientific evidence, *see United States v. Gipson*, 24 M.J. 246, 251–52 (C.M.A.1987), general acceptance in the scientific community remains an important factor in determining admissibility.[5] *Id.* at

---

comes within the Rule." M.C.M., 1984, Analysis of Mil.R.Evid. 403, App. 22, A22–28.

3. Rule for Courts–Martial 1001(b)(4) [hereinafter R.C.M.] pertains to evidence in aggravation during the presentencing hearing and states in part: "The trial counsel may present evidence as to any aggravating circumstances directly relating to or resulting from the offenses of which the accused has been found guilty."

The discussion of R.C.M. 1001(b)(4) states that "[e]vidence in aggravation may include evidence of ... social, psychological, and medical impact on ... any person ... who was the victim of an offense committed by the accused...."

4. Military Rules of Evidence 401 through 403 define "relevant evidence," indicate its general admissibility, and identify grounds on which it may be excluded. *See supra* note 2.

5. In *Gipson*, Judge Cox writing for the Court notes that the Military Rules of Evidence provide a "comprehensive scheme for processing expert testimony." 24 M.J. at 251. Since the Court had earlier recognized in *United States v. Snipes*, 18 M.J. 172, 178 (C.M.A. 1984), that the "thrust" of the new evidentiary rules was to make more expert testimony available to the fact-finders, Judge Cox then proceeds to announce the Court's abandonment of the *Frye* standard. He writes: "We ... agree that *Frye* has been superseded and 'should be rejected as an independent controlling standard of admissibility.'" 24 M.J. at 251 (citations omitted). Next, Judge Cox informs trial judges that,

252. In this instance we do not find that a sufficiently valid body of scientific knowledge has been developed concerning the reliability of the therapist-patient sex syndrome. *See United States v. Snipes*, 18 M.J. at 179 ("sufficient body of 'specialized knowledge' [exists] as to the typical behavior of sexually abused children and their families...."). It appears that both the validity of the underlying scientific principles and the technique for applying those principles are very much open to question in the scientific community at this point in time. Accordingly, we conclude that the military judge abused his discretion in allowing Dr. Bouhoutsos' testimony about the therapist-patient sex syndrome. In our view, this so-called "syndrome" does not meet the threshold test of reliability.[6]

■ Further, we decline appellate government counsel's invitation to apply the waiver doctrine because of the absence of a timely defense objection to syndrome evidence during the course of Dr. Bouhoutsos' testimony. *See* Mil.R.Evid. 103(a)(1) (timely objection must be made to preserve error predicated upon an evidentiary ruling). We believe that defense's initial motion, challenging testimony as to the therapist-patient sex syndrome, was sufficient to preserve the error.

■ To gauge the effect of this error, we must not only consider the content of Dr. Bouhoutsos' testimony but the remaining expert testimony presented by both sides during sentencing. Dr. Bouhoutsos qualified as an expert in the area of therapist-patient sexual acts and her testimony was relevant. The error was not in the admission of her testimony *per se*, but in

allowing her to give it scientific legitimacy by relating it to a syndrome. Under the circumstances, we find that her testimonial references to the therapist-patient sex syndrome constituted harmless error. Uniform Code of Military Justice, art. 59(a), 10 10 U.S.C. § 859(a) (1982).

The most significant portions of Dr. Bouhoutsos' testimony, with the exception of her references to a syndrome, were corroborated not only by another government expert, a psychiatrist, but by defense experts as well. This included testimony that (1) Mrs. A had psychologically withdrawn and was isolated from others, (2) she was a woman looking for someone to take care of her, not sex, (3) a therapist is responsible for his patient's actions during therapy, (4) a patient is highly vulnerable during the therapeutic process and the therapist should expect demonstrations of affection and even sexual propositions, (5) it is reasonable for a patient to fear the loss of a therapist who has become the patient's "life line," (6) Mrs. A was suicidal, and (7) her prognosis for recovery was much worse than it was before she started seeing appellant.

With regard to the testimony concerning the therapist-patient sex syndrome, the defense through cross-examination of Dr. Bouhoutsos and through the direct testimony of its own experts established the manner in which a syndrome was validated for inclusion in the DSM. This testimony showed that the therapist-patient sex syndrome was not recognized in the DSM III, and that the defense experts knew of no forum where the syndrome had been accepted as valid.

"[i]ronically, one of the most useful tools" in determining the admissibility of expert testimony is the general acceptance in the expert's specialty of the principles which are the underlying basis of the testimony. *Id.* at 252. So, while the *Frye* standard, *see supra* note 1, is no longer the "end-all" standard in courts-martial, it is a significant factor which should be considered.

This is underscored in Chief Judge Everett's concurring opinion in *Gipson* where the Chief Judge writes:

As I interpret the principal opinion, it seeks to provide a military judge some discretion to admit evidence that might be excluded under

a mechanical application of the test announced in *Frye*.... Although in my view the *Frye* test has been useful, *I am persuaded that a slight relaxation of it is now in order.* 24 M.J. at 254 (emphasis added).

6. Although *Gipson* involved physical scientific evidence (polygraph evidence), the same test is applicable to the admission of expert testimony generally. *See* Mil.R.Evid. 702. Some examples of testimony involving "other specialized knowledge" would be testimony regarding psychological testing, psychiatric diagnosis, and various stress syndromes.

Considering the relevance of Dr. Bouhoutsos' testimony apart from the challenged syndrome, the corroboration of key parts of her testimony by other experts, and the extent to which the validity of her proffered syndrome was undermined by other experts, we do not find the syndrome's erroneous admission to be a talisman for appellant. The substantive content of Dr. Bouhoutsos' testimony did not differ significantly from that of the other experts who testified. We are satisfied that, despite the error noted, appellant was sentenced on reliable and properly obtained evidence that, together with the military judge's instructions, provided clear guidelines to the members regarding an appropriate punishment.

Assuming *arguendo* that the admission of the syndrome evidence was prejudicial error, we still are convinced that "the sentence adjudged ... [is] 'no greater than that which would have been imposed if the prejudicial error had not been committed.' " *United States v. Kinman,* 25 M.J. 99, 100 (C.M.A.1987) (quoting *United States v. Suzuki,* 20 M.J. 248, 249 (C.M.A. 1985)). *See also United States v. Sales,* 22 M.J. 305, 307–08 (C.M.A. 1986).

■ Appellant also asserts that Specification 1 of Charge II (adultery) is multiplicious for findings with Specification 2 of Charge II (indecent acts by masturbating and ejaculating on Mrs. A) and the Specification of Charge I (sodomy). We disagree. *See United States v. Holt,* 16 M.J. 393, 394 (C.M.A. 1983); *United States v. Baker,* 14 M.J. 361 (C.M.A. 1983).

■ Nor do we find any merit in appellant's assertion that the Specification of Charge I (sodomy), and the two specifications of Charge II (adultery and indecent acts, respectively), are multiplicious for sentencing purposes. We find that the military judge properly instructed the members that only the adultery specification was multiplicious for sentencing and, consequently, the sodomy and indecent acts specifications remained separate. *Cf. United States v. Cox,* 18 M.J. 72 (C.M.A.

1984) (sodomy and indecent liberties held separate offenses).

We have considered the issues personally raised by appellant and find them to be without merit.

■ With regard to sentence appropriateness, appellant was involved in a series of sexual encounters with a junior officer's wife during a time she was his patient. The evidence is uncontroverted as to her vulnerability during therapy and as to the dominant role that a therapist assumes in a patient's life during the therapeutic process. The appellant's decision to become sexually involved with Mrs. A was not only unethical, but ended the therapy. Further, his pretrial agreement allowed the convening authority to approve any sentence adjudged except a term of confinement in excess of three years. *See United States v. Hendon,* 6 M.J. 171, 175 (C.M.A. 1979). In sworn testimony before the members, appellant made his sentencing preferences known. He testified in part:

> If you believe that my mistake has tarnished the image of the Army beyond my contributions to it, I asked to be dismissed, perhaps even fined. Confinement would mean total destruction.

The members in deliberating on sentence apparently decided that appellant's crimes had tarnished the image of the Army beyond any contributions that appellant had made. Having reviewed the entire record, we find ample evidence to support the members' decision in this regard.

An appropriate sentence was adjudged.

The findings of guilty and the sentence are affirmed.[7]

Chief Judge HOLDAWAY and Senior Judge De GIULIO concur.

---

7. This was a deceptively complex case. There were numerous multi-part motions and exten-

sive expert and character testimony during the sentencing phase. The case was characterized by excellent advocacy and a trial judge who exercised firm but fair control in assuring the trial's orderly progress. It was, in our opinion, "well and truly tried." *United States v. White,* 25 M.J. 50, 52 (C.M.A. 1987) (Cox, J.).